## LORETTA P. STRAUFF, EXECUTRIX *v.* DENNIS KAVANAUGH

[No. 35, April Term, 1934.]

*Decided June 12th, 1934.*

The cause was argued before BOND, C. J., URNER, ADKINS, OFFUTT, DIGGES, PARKE, and SLOAN, JJ.

*Edward H. Burke* and *Daniel B. Leonard,* with whom were *Bowie & Burke* on the brief, for the appellant.

*William Saxon,* with whom was *Edwin H. Brownley* on the brief, for the appellee.

ADKINS, J., delivered the opinion of the Court.

Edward A. Strauff purchased all the stock, 10,500 shares, of the Security Life Insurance Company of Maryland at a sale of said stock by the holders of a note for $100,000 for which the stock had been pledged as collateral security. The note was originally given to the Atlas Realty Company of Baltimore City by a holding company to which the stock had been assigned by all the stockholders, and on default the note was assigned to Strauff and his wife, and sold by them under the terms of the collateral agreement. On the death of Strauff the stock passed to the appellant as his executrix.

This suit is based on the contention of the plaintiff that he was induced to transfer his 1,500 shares of said stock to the said holding company by the oral promise of Strauff that he would put into the concern a sufficient amount to purchase the 7,500 shares of the five stockholders, other than plaintiff and Harry G. Calvert, who held 1,500 shares each, and that upon the acquisition of the stock of said other stockholders, these shares, together with the 1,500 shares of plaintiff and the 1,500 shares of Calvert, would be assigned to and held by a holding company to be organized for that purpose, and that the stock of said holding company would be issued to plaintiff, Strauff, and Calvert in equal amounts, so that each would have a one-third interest in said holding company, and that Strauff would look solely to the earnings of said holding company for repayment of any sums which he would furnish for the acquisition of said outstanding five interests, and that he would continue to finance the purchase of said other five interests until such time as the earnings of said holding company should be sufficient to pay off the amounts so furnished by Strauff. These allegations are contained in the 13th paragraph of the bill of complaint. The preceding paragraphs set out the long connection of the plaintiff with the industrial insurance business; the formation of the company under another name in 1909 by plaintiff and six associates, and its change of name to that of "Security Life

Insurance Company of Maryland," and its continua-ance in business up to the present time; its capitalization into 10,500 shares of common stock of the par value of one dollar per share, divided equally between the seven associates, who held the same up to June 6th, 1929; that plaintiff was always its president; that the corporation greatly prospered under their management; the promi-nence of Strauff as a lawyer and real estate man, until his death on November 2nd, 1933, and the probate of his will on November 7th, 1933, and the grant of letters testa-mentary to his widow, Loretta P. Strauff; the association of Strauff and Calvert as attorney and client, and also in the real estate business since 1906; that in the year 1928 Strauff informed Calvert that he, Strauff, had a large sum of money available and wanted to get into the industrial insurance business and would like to buy out plaintiff's company, with which he knew Calvert was connected, and instructed Calvert to interview and interest plaintiff in such a proposition; that in February, 1929, at the invita-tion of Strauff a conference was had between Strauff, Calvert, and the plaintiff, at which Strauff announced his affluence and his desire to become associated with plaintiff and Calvert in the insurance business, and offered to fur-nish the necessary money to buy out the remaining five interests in said company if plaintiff and Calvert would continue as officers, and devote their skill and experience to the growth of the company; that Strauff then pro-ceeded to examine the affairs of the company and ap-praised the value of all the stock at $280,000. In the para-graphs following the 13th it is alleged that plaintiff, at the time of said proposal, informed Strauff that he desired to consult his own attorney in reference to all matters touching the interests of plaintiff, and especially the pro-posed plan suggested by Strauff, and the manner of carry-ing the same into effect, but that Strauff strenuously ob-jected, claiming that plaintiff was going into a very large undertaking on an equal basis with Strauff, and therefore ought to have sufficient confidence in him to allow him to represent plaintiff as counsel and attorney in said transac-

tion, and that as a result of said objection, and, relying upon Strauff's assurance of protection of plaintiff's interests, he entrusted the drafting of necessary papers and handling of the transaction to Strauff, who thereby undertook to represent plaintiff as attorney in said transaction; that, upon obtaining authority to represent plaintiff, Strauff proceeded to consummate the transfer of all the stock to a holding company, and on or about March 8th, 1929, presented a paper prepared by him, which he represented to plaintiff was the first step in carrying out the agreement they had entered into, and instructed plaintiff to have all the stockholders execute, and that, believing that said paper was in proper order to carry into effect the aforesaid understanding, plaintiff, with the other six stockholders, executed said paper, marked complainant's Exhibit "B." (Then follow allegations as to other papers marked as exhibits, which plaintiff alleges he executed on the representation of Strauff that they were necessary to carry out the said agreement); that on or about June 6th, 1929, Strauff called a meeting of all the stockholders and obtained, endorsed in blank, the sealed certificates of stock representing 10,500 shares, on the following terms: Wm. M. Powell cash $40,000; H. C. Powell cash $40,000; Ida M. Powell cash $10,000, and a note for $30,000 executed by the Security Holding Company No. 2; James O. Whaley cash $10,000 and a note for $30,000 of said holding company; Estate of Louis M. Eastman, Jr., note of said holding company for $40,000; that plaintiff and Calvert were induced by Strauff to assign in blank their respective certificates for 1,500 shares each, the said Strauff stating that he would forthwith proceed to straighten out all matters and prepare all necessary agreements and documents, so as to fully carry out their understanding and agreement as set forth in paragraph 13 (erroneously designated 12 in bill); that at said meeting directors were elected, including Strauff, and plaintiff was elected president, Calvert secretary, and Strauff treasurer; that on or about March 20th, 1929, relying upon representations of Strauff that they were necessary to carry out said agree-

ment (in paragraph 13) plaintiff became one of the incorporators and executed charters, prepared by Strauff, of Security Holding Company No. 1, and Security Holding Company No. 2, and also signed certain option agreements and voting trust agreements relative to the stock of said holding companies; that plaintiff, having implicit confidence in the honesty and integrity of Strauff, was induced by Strauff to endorse a certain note dated June 6th, 1929, for $100,000, made by the said Security Holding Company No. 1, payable to the order of the Atlas Realty Company of Baltimore City, Strauff representing that the execution of said note and the endorsement thereof by plaintiff was merely to preserve a record of the transaction between the parties as evidence of the fact that the sum of $100,-000 had been advanced by him in connection with the transaction, which was to be repaid out of the earnings of the said holding company; that the said Atlas Realty Company was owned and controlled entirely by him, and that said note was not for the purpose of creating, and did not in fact create, any liability upon plaintiff for the payment thereof; that plaintiff signed the agreement marked Complainant's Exhibit "K" on the representation of Strauff that the execution of said paper was necessary for the purpose of enabling Strauff as attorney for the parties in interest to adjust certain income tax matters with the Internal Revenue Department, Strauff assuring him that said agreement was merely for the purposes of record, and did not alter in any manner their status, or affect the agreement set out in paragraph 13; that not until March 23rd, 1933, did plaintiff become aware of the fact that all the shares of stock of the Security Life Insurance Company, including plaintiff's 1,500 shares, which had been endorsed in blank and delivered to Strauff, instead of being held by the holding company, in accordance with the original agreement, had been fraudulently assigned by Strauff to The Atlas Realty Company, and that Strauff had, without the knowledge and consent of plaintiff, secretly and fraudulently stripped the said holding companies of all assets, so that the stock thereof was worth-

less; that plaintiff did not understand the purport of Strauff's letter of March 24th, 1933 (notifying plaintiff as president of the holding company that the Atlas Realty Company would proceed with the sale of the stock), filed as complainant's Exhibit "L," which letter was received when plaintiff was suffering from a nervous breakdown; that after a period of four weeks, when plaintiff had partially recovered from his illness, and was able to get about, he made strenuous efforts to see Strauff in order to secure an explanation of matters, but was evaded by him on the pretext that he was ill and unable to see him at the time, but would take up the matters as soon as he, Strauff, was able to do so; that the procuring of said agreements from plaintiff by Strauff, upon the representations and assurances aforesaid, and plaintiff's endorsement of said note, and the formation of said holding companies, was part of a scheme devised by Strauff to cheat and defraud plaintiff and his former associates out of their stock, so that Strauff could appropriate the stock to himself; and that, in consequence of said false and fraudulent representations by Strauff and his breach of duty towards plaintiff as his attorney in said transactions, plaintiff has been defrauded out of his stock. The prayer of the bill is:

(1) That the said contracts, agreements, options and notes entered into, executed or endorsed by plaintiff be declared null and void.

(2) That defendants (Loretta P. Strauff, executrix, The Holding Companies Nos. 1 and 2, and The Atlas Realty Company) be required to transfer and return to plaintiff the 1,500 shares of stock delivered by him to Strauff endorsed in blank.

(3) For injunction restraining the defendants from transferring said stock.

(4) For an account of all moneys received by defendants by way of dividends, salaries, or gratuities.

(5) That defendants be required to answer under oath and to set forth in detail who is in possession of said 1,500 shares of stock and of said note of Security Holding No. 1

for $100,000, and to deliver said 1,500 shares to the clerk to be impounded.

(6) For general relief.

A demurrer to the bill and each paragraph thereof was overruled. Whereupon the executrix filed her answer under oath, in which she denied all of the allegations of fraud or wrongdoing on the part of Strauff, and the allegations that Exhibit "B" and other papers were signed and executed by plaintiff as a result of false or deceptive representations made by Strauff, or that plaintiff believed or had any reason to believe that plaintiff's Exhibit "B" was intended to carry into effect the alleged oral agreement, or that any of the other papers were intended for that purpose, or that plaintiff and Calvert were induced by any such representations to sign in blank and deliver their respective certificates of stock. She denied that the Atlas Realty Company was owned solely by Strauff; that Exhibit "K" was executed at the request of Strauff, to enable him as attorney for the parties in interest to adjust certain income tax matters, but avers that it was executed at the request of plaintiff and Calvert to enable them to more readily adjust their income tax matters with the Internal Revenue Department. She denied that it was not until March 23rd, 1933, that the plaintiff became aware of the fact that all of the stock of the Security Life Insurance Company had been assigned to the Atlas Realty Company; she further denied that the assignment of said stock to the Atlas Realty Company was fraudulent, or that Strauff had, without the knowledge and consent of plaintiff, secretly and fraudulently stripped the Holding Companies of all assets; she demanded strict proof of plaintiff's allegations that, at the time he received Strauff's letter of March 24th, 1933 (notifying plaintiff that the stock would be sold), plaintiff was suffering from a nervous breakdown; she denied that plaintiff made numerous efforts thereafter to see Strauff and that he evaded plaintiff on any pretext whatsoever, and on the contrary asserted that, before and after March, 1933, and continually down to his last illness, Strauff was at the

office of the Security Life Insurance Company from early in the morning until late in the evening, and in fact conducted the business of his law office from that place, and was devoting practically all of his time to the affairs of said company and was in almost daily contact with the plaintiff; she denied that the procuring of said agreements from plaintiff, and the endorsement of said note, and the formation of said holding companies, was part of a scheme devised by Strauff to cheat and defraud plaintiff and his former associates of their stock, so that Strauff could get possession thereof, or that by false and fraudulent representations made by Strauff, and breach of his duty as plaintiff's attorney in said transaction, plaintiff had been defrauded out of his stock. The answer then goes on to give a history of the transaction, and avers that the true agreement between the plaintiff and Strauff and Calvert is apparent from the exhibit filed with the bill, and that the oral agreement set out therein is of itself improbable and incredible; that each and every allegation of fraud and bad faith and misrepresentation set out in the bill is expressly denied. It further avers that Strauff was not attorney for plaintiff; that he neither received any retainer from plaintiff nor made any charge for the preparation of any of the papers connected with the transaction; that the correspondence indicates that Strauff informed plaintiff that he was not his attorney in any transaction, and did not represent him and advised him to employ counsel, which plaintiff refused to do. The allegations of the 14th, 15th and 16th paragraphs are denied (in which it is charged that Strauff objected to the suggestion of plaintiff that he obtain advice from his personal counsel, and obtained authority from plaintiff to represent him) except that it is admitted that Strauff prepared all the papers and agreements that were executed by the stockholders. The answer in concluding invokes the doctrine of laches.

Against the sworn answer of the appellant, in which is denied the alleged relationship of attorney and client, and every allegation of fraudulent conduct, and against

the documentary evidence filed as exhibits by plaintiff himself, the plaintiff offers no substantial evidence in support of his charges except his own testimony and that of Calvert. The plaintiff, of course, was barred by the evidence act from testifying to any transactions between himself and Strauff. He did, however, give some remarkable testimony, considering his business experience of forty-five years and the important position he held as president of the insurance company since 1909, of his failure to understand the meaning of papers which he signed, and his childlike faith in Strauff, with whom he had slight acquaintance, and his willingness to believe everything Strauff told him and to sign any paper he presented, however inconsistent it might be with the alleged oral agreement, that admitted of no misunderstanding by a person of any intelligence. This is especially true of plaintiff's Exhibits "B" and "C." The first is a paper signed by all the owners of shares of the Security Life Insurance Company, dated March 8th, 1929, in which it is stated that the parties have met for the purpose of making a matter of record the agreement of all the parties that the individual agreements to be signed by the owners of shares of said company are to be based upon a sale and transfer of one hundred per cent. of the stock of that company; that the said sale was to be for cash, deferred payments, and stock in the Security Holding Company No. 1, it being understood that, upon the completion of this transaction, the interests represented by Strauff would advance $100,000 in cash, "for which they are to hold as security the stock of the Security Life Insurance Company, and that all preferred stock issued by the Security Holding Company No. 1 will be subject to said advance." It was further agreed that the statement was not to be binding upon the owners of the Security Life Insurance Company stock until they had each individually signed their individual agreements for their undivided holdings—which they all did.

Plaintiff admits that he has had in his possession duplicates or copies of these papers since June 6th, 1929.

Plaintiff's reliance must be upon the witness Calvert,

whose testimony is even more remarkable than that of the plaintiff himself. It is by Calvert he undertakes to prove the alleged oral agreement. Before undertaking to analyze the testimony of this witness something should be said as to his bias and credibility. He was naturally prejudiced against Strauff and in favor of the plaintiff, because he had lost his position with the company at the insistence of Strauff by reason of misconduct. He had previously gotten into difficulties with the company, and plaintiff had befriended him by being personally responsible for his obligations. The conduct which resulted in his final elimination was of such a character as to affect his credibility as a witness, and without his testimony the whole case of plaintiff falls. But the testimony loses its weight not only by reason of the character of the witness. In itself it is contradictory in its various parts, and inherently improbable. In his examination in chief the witness said Strauff spoke of his $100,000 contribution as "grist in the mill," that he "explained it by saying they would never be called on, that it would be just his invested capital." "It never was to be paid back"; that the $100,000 note was "for matters of convenience in case of any financing being necessary in the future as regards the purchase of other companies." And on cross-examination he said that Strauff "was always to have a direct lien for his $100,000. Q. And what was he to have that lien on? Ans. Naturally on the Security Life Insurance Company. Q. You understood that, didn't you? Ans. Certainly so. Q. Mr. Kavanaugh understood it so, didn't he? Ans. I would say yes to that."

Being confronted with papers signed by him which were absolutely inconsistent with his story, he contented himself with saying that he signed anything Strauff told him to sign. But there was one paper which he not only signed but made affidavit to, namely, the report to the Government in a tax matter, hereinafter referred to, in which Strauff insisted upon acting as attorney for all the parties, and when plaintiff expressed a desire to have his own attorney, denied him that privilege, saying that he

"would have to depend upon him in blind confidence." This, the witness said, occurred at a meeting immediately prior to the reorganization of the company. By this testimony it is contended by plaintiff that the relation of attorney and client is established and that the burden of proof is shifted.

We need not stop to consider whether that relation existed at the time of the reorganization. There is no evidence that any such relation existed on March 8th and 9th, 1929, when the papers marked Complainant's Exhibits "B" and "C" were signed. By the first it was agreed that interests represented by Strauff would advance $100,000 "for which they are to hold as security the stock of the Security Life Insurance Company, and that all preferred stock issued by the Security Life Holding Company No. 1 will be subject to said advance," and that, all of the stockholders would sell and transfer their stock to the Holding Company; and by the second, the plaintiff individually agreed to sell his stock to Holding Company No. 2, and to take in payment therefor 400 shares of preferred stock of said Holding Company No. 2 and 400 shares of preferred stock of Holding Company No. 1. It was further agreed that plaintiff should be employed as an officer of the Security Life Insurance Company at a salary of not less than $100 per week, and should also be a director of said company.

At that time, according to plaintiff's own testimony, Mr. William Kerr was his attorney. Q. Please tell us during what period Mr. William Kerr represented you? Ans. Why * * * from the 6th day of March to the 6th day of June is about thirteen weeks, Mr. Kerr represented me about thirteen weeks, when I was told by Mr. Strauff he would represent me, that I could not have Kerr. I let Kerr go.

After the date when it is contended that Strauff began to act as attorney for plaintiff, all the proceedings, as shown by the documentary evidence, were in entire accord with the agreements of March 8th and 9th. Even if it be true that plaintiff on and after June 6th was relying en-

tirely upon Strauff as his attorney and did not understand all that was done, he cannot complain, since no advantage appears to have been taken of him by Strauff. But plaintiff is estopped to deny that he understood the entire plan by his own representations to four reliable and disinterested witnesses.

In 1932 he was charged by the Government with failing to report profits from the sale of the stock. He employed Mr. Johnson and Mr. Hall, two certified accountants, to prepare a brief in his defense. This brief was made up from the very documents filed in this case and from information furnished in part by plaintiff himself, and, when the brief was completed and discussed with plaintiff, he signed and made affidavit to it. In this brief the claim was made that plaintiff had received no profits from a sale, that the entire stock of the Security Life Insurance Company had been transferred to the Holding Company and had been pledged by that company as collateral security to a note for $100,000 given by the Holding Company to the Atlas Realty Company. The same statement was made by plaintiff to Mr. George Dobbin Penniman in 1930 and to Mr. James J. Lindsay in August of 1933. The testimony of these four witnesses is uncontradicted.

The stock was sold under the terms of the collateral note on March 30th, 1933, after notice to plaintiff as president of Holding Company No. 1, and a reply from the company signed by the plaintiff as president, stating that the company was unable to comply with the terms of the note, and consenting to the sale. It does not appear that either before or after the sale there was the slightest protest made; or that any question was ever raised until after the death of Strauff. No testimony was offered in support of the allegation in the bill, that plaintiff was ill at this time, and that after his recovery Strauff evaded him. The record presents no case for relief.

*Decree reversed and bill dismissed, with costs.*